Judgment rendered October 2, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,959-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JEREMY JONES                                        Plaintiff-Appellant

versus

JESSICA ANNE SHELTON                                Defendant-Appellee

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 62,147

Honorable Thomas Wynn Rogers, Judge

* * * * *

CUMMINS & FITTS, LLC                                Counsel for Appellant
By:  Daniel C. Cummins
     Jessica L. Fitts

RICK L. CANDLER

CARMOUCHE, BOKENFOHR,                               Counsel for Appellee,
BUCKLE & DAY                                         Jessica Anne Shelton
By:  John N. Bokenfohr

KEESHA MASON BORDELON                               Counsel for Appellee,
                                                    State of Louisiana,
                                                    Department of Children
                                                    and Family Services

* * * * *

Before PITMAN, THOMPSON, and ROBINSON, JJ.

**THOMPSON, J.**

An acrimonious custody dispute between parents over their only child resulted in the father seeking domiciliary custody and filing multiple motions for contempt, alleging the mother had repeatedly violated the court's custody orders. At trial, the court heard witnesses and examined the evidence presented by both parties and undertook a careful examination of the evidence and a thorough application of the La. C.C. art. 134 factors. The trial court determined that the best interest of the child was to award the parents joint custody and named the mother as domiciliary parent. The father appealed. For the following reasons, we affirm the trial court's ruling.

## FACTS AND PROCEDURAL HISTORY

Jeremy Jones ("Jeremy") and Jessica Shelton ("Jessica") are the parents to a six-year-old child, C.J. Jeremy and Jessica were married in 2007 and divorced in 2010. Sometime after their divorce, they reestablished their relationship, and C.J. was born in July of 2017. It appears the parties had a cordial relationship from 2017 through the end of 2018. Jeremy was working out of town and exercised visitation with C.J. during this time. There was a break in Jeremy and Jessica's relationship in November of 2018, allegedly due to Jeremy's relationship at the time with his now wife, Bailey. Jeremy relocated to North Carolina, and the parties dispute the amount of time Jeremy visited C.J. Jeremy contends he saw C.J. monthly from 2018 until the summer of 2020, and Jessica alternatively argues that Jeremy was essentially absent during this time period. The parties agree that on May 1, 2019, they entered into an extrajudicial custody agreement, which

named Jessica as the custodial parent and gave Jeremy specific periods of visitation.

By the summer of 2020, Jeremy, his wife, Bailey, and her three children returned to Ruston, Louisiana. Jessica lived in Covington, Louisiana with C.J. Jeremy had custody of C.J. for half of the summer and began exercising regular and frequent visitation. In December of 2021, Jeremy, Bailey, and Jeremy's adult daughter stayed with Jessica and C.J. to celebrate Christmas. Jeremy took C.J. from Covington, Louisiana back to Ruston, as he and Jessica had planned. Jeremy left Covington concerned about C.J.'s wellbeing after the evening spent at Jessica's house. The original plan was for Jeremy to return C.J. on January 2, 2022, but that date was pushed back when Jessica contracted Covid. They agreed to exchange C.J. on January 7, 2022. In the interim, C.J. contracted Covid, and the parties agreed to again push the exchange date back one more week. On January 18, 2022, Jeremy filed a petition in Lincoln Parish for legal custody of C.J. in response to the concern he had about Jessica's ability to care for her after their December visit to her home. He refused to return C.J. to Jessica's custody.

Jessica moved from Covington to East Baton Rouge Parish and filed her own separate petition for custody in that parish. On February 23, 2022, without notifying Jeremy, Jessica drove from Baton Rouge to Ruston, checked C.J. out of her school in Ruston, and returned with her to Baton Rouge. On March 24, 2022, Jessica filed, in the Lincoln Parish proceedings, exceptions of no right of action, *lis pendens*, improper venue, and *forum non conveniens* in this matter. A hearing was held in Lincoln Parish on April 14,

2

2022, and the trial court denied Jessica's exceptions. The court ordered that the custody hearing would take place in Lincoln Parish. That court issued an interim order, decreeing that C.J. would stay with Jessica contingent on her returning to school, with Jeremy having custodial periods. The court order detailed that Jeremy would have custody from Friday at 5:00 p.m. until Sunday at 5:00 p.m., with the parties meeting halfway at the Alexandria police department for the exchange. Jeremy would have custody of C.J. the entire summer. The court ordered that neither party should have overnight guests of the opposite sex that are not related by blood or affinity while C.J. was in residence. Finally, the court ordered that the parties would have unsupervised telephone communications with C.J. when the child is with the other parent between the hours of 6:00 p.m. and 7:00 p.m.

On July 13, 2022, in the Lincoln Parish proceedings, Jessica filed a motion for penalties for failure to give notice of relocation pursuant to La. R.S. 9:355.6, a motion to enforce extrajudicial custody agreement, and motion to change venue to proper jurisdiction of East Baton Rouge Parish. On January 25, 2023, Jeremy filed in the Lincoln Parish proceedings a petition for *ex parte* emergency custody, arguing that Jessica's behavior had been neglectful, irresponsible, reckless, and unpredictable. He described how Jessica refused to allow telephone calls between himself and C.J. and an incident when she refused to allow him to see C.J. during his allotted custody time. He described her multiple failed drug tests, chronic lateness, and the significant amount of school that C.J. had missed while in her care.

The trial court issued another interim order, dated January 20, 2023, ordering that Jeremy would have Christmas visitation with C.J., that Jeremy

3

would have every other weekend visitation, that the retrieving parent must pick up from the other parent's home, and that Jessica must submit to a ten-panel urine drug screen. On February 6, 2023, Jessica answered Jeremy's petition for *ex parte* emergency custody and filed a reconventional demand arguing that she should have sole custody of C.J. Jessica contended that C.J.'s stepsister was molesting C.J. at Jeremy's house and that she had instituted a Department of Child and Family Services ("DCFS") investigation into the matter.

By interim order dated March 22, 2023, the trial court dismissed each of the petitions for emergency custody and ordered that Jeremy shall continue to have his regular visitation with C.J., as long as she stayed overnight at her grandparents' home. It further ordered that C.J. could be around her stepsibling, just not alone with her, and that Jeremy was entitled to every other night telephone calls with C.J. for a maximum of 15 minutes between 6:00 p.m. and 6:45 p.m. Jeremy filed an amended petition for *ex parte* emergency custody on May 26, 2023, adding additional exhibits and updated information from his previous petition.

On July 17, 2023, a bench trial was held in Lincoln parish. Jessica was the first witness to testify. She testified that she was late to court and that she was driving on an expired license. In the two months prior to the trial, Jessica had moved to Prairieville, Louisiana. Jessica is a licensed master social worker and is currently employed with a behavioral health company. She had been terminated from two prior jobs, which she denied was caused by chronic tardiness. She testified that C.J. had recently been diagnosed with sensory processing disorder and believes that this disorder

4

has made it difficult for C.J. to timely prepare for school in the mornings. Jessica noted that she has ADHD, which causes her to struggle with timeliness.

Jessica described how she reported the disclosure made to her by C.J. regarding the sexual molestation and followed up with the Ruston Police Department multiple times for updates. She acknowledged that C.J.'s tardiness during kindergarten negatively affected her school performance but denied knowing about monthly Zoom meetings for parents or receiving multiple letters regarding the school's attendance policy. She testified that C.J. would be attending public school in Prairieville and would ride the bus each morning. She anticipated that this, along with therapies for the sensory processing disorder, would help with tardiness. Jessica acknowledged that she served a year in federal prison at age 19 after a conviction for misprision of a felony.

Jessica testified that she has ADHD and lupus and takes prescription amphetamines and opiates for the treatment of those diseases, which helped explain the results of what appeared to be failed drug tests. She described how one time she was out of her hydrocodone and took a friend's Percocet, which later showed up on a drug screen. She testified that she always tried to include Jeremy in parenting decisions, including the doctors' appointments for C.J. Jessica testified that Jeremy was almost completely absent for years while he was in North Carolina, and she cared for C.J. alone. She described her devotion and care for her daughter, who is her only child.

Lieutenant Marchale Canty, with the Ruston Police Department Criminal Investigation Division, testified that he investigated the abuse allegation made by C.J. He testified that he closed the investigation after reviewing the interview with C.J. by the forensic investigator because he believed that C.J. was being coached regarding the allegations. He noted that DCFS interviewed all of the Jones children and similarly closed their investigation. Lt. Canty testified that he had only interviewed Jeremy and did not interview Jessica or the accused child. He did not have an answer for the trial court about why he did not question Jessica about coaching her daughter, if that is what he believed was happening in the situation.

Dr. Aimee Blackham, C.J.'s therapist, testified that C.J. is a precocious child with a strong, adult vocabulary. She confirmed that DCFS unsubstantiated the claim made by C.J. and stated that nothing learned in her sessions with C.J. would trigger her role as a mandatory reporter. Dr. Blackham testified that C.J. is clearly loyal to Jessica. She testified that C.J. remarked, "there's only one home and it's with biological mom."

Jeremy was the last witness to testify. He testified that he has three other biological children in addition to C.J. and has adopted his wife Bailey's three children as well. He admitted that he was less present for C.J.'s early life and that he entrusted Jessica with her primary care. He admitted to a conviction for domestic abuse battery during a previous relationship. Jeremy testified that he was disturbed by Jessica's behavior in December of 2021, which is why he removed C.J. from her care and filed for custody. Jeremy stated that the teachers at her school in Ruston said C.J.

was behind academically and needed occupational therapy to help with her grip strength.

He lives with his wife, her three children, his sister-in-law, and her son. Jeremy contends that C.J. failed kindergarten, although under cross-examination admitted that he believes this to be true because her contract at her private school was not renewed. Jeremy described Jessica's chronic tardiness for custody exchanges and his concern over her drug use. He expressed his concerns over C.J.'s absences and tardiness at school and her medical treatments. Specifically, he noted that in December of 2021, C.J. was behind on her immunizations and needed to see an optometrist for her eye problem. He also referred to a document that described C.J. as anorexic. Upon questioning by the court, he agreed that the document was not issued by a specific doctor, and he had never sought specific treatment for anorexia for C.J. He testified that he has attempted to coparent C.J. well with Jessica. When asked directly by the court what kind of custody he wanted, Jeremy stated that he wanted domiciliary custody of C.J., with shared custody with Jessica.

After taking the matter under advisement, the trial court rendered its judgment in open court. The trial court first stated that it had made an assessment of the two principal witnesses and found both Jessica and Jeremy had a tendency to be evasive with their answers. However, the court stated that "in particular, I found Mr. Jones' credibility to be lacking in many respects. I felt that there were contradictions in his testimony and just his demeanor and his unwillingness to admit facts that were adverse to him." The court concluded that Jessica was more candid and credible as a witness.

The court then found the following, regarding La. C.C. art. 134 best interest of the child factors (hereinafter, the "Article 134 factors"):

1. Potential for abuse: The court noted the allegations of abuse of C.J. but stated that there was no credible evidence to indicate the abuse occurred. It found that this factor did not favor either parent.

2. Love, affection, and emotional ties between parent and child: The court stated that this factor favored Jessica because she was C.J.'s primary caretaker for three and a half years, while Jeremy was on the East coast. The court noted Dr. Blackham's testimony about C.J.'s devotion to her mother.

3. Capacity and disposition of each party to give love, affection, and spiritual guidance and to continue the education and rearing of the child: The court found that both parents have the capacity and disposition to give C.J. love and affection. Neither parent indicated they would provide spiritual guidance. The court found this factor favored neither parent but did note its concern about the amount of tardies C.J. had at her previous school.

4. Capacity and disposition to provide the child with food, clothing, medical care, and other needs: The court noted the diverging testimonies of the parties regarding medical care and other material needs. The court acknowledged the diagnosis of anorexia that had been made for C.J. but noted that it seemed "sketchy" because the diagnosis was on an exhibit from a hospital with no doctor's name. The court was not provided testimony from a doctor or physician's assistant regarding this diagnosis. The court found that Jessica had not neglected C.J.'s medical needs or failed to provide her with adequate food.

5. Length of time the child has lived in a stable, adequate environment, and the desirability of maintaining that environment: The court noted that C.J. was born in 2017 and lived almost exclusively with her mother until December of 2021, when Jeremy removed C.J. from her care and refused to return her. The court noted that Jeremy's original petition for custody did not include any of the specific allegations made at trial. The court found this factor favored Jessica.

6. The permanence, as a family unit, of the existing or proposed custodial home, or homes: The court found this factor did not favor either parent.

7. The moral fitness of each party insofar as it affects the welfare of the child: The court noted that much was made during trial of Jessica's conviction when she was a very young woman. However, the court found that "the fact that a criminal charge that old was brought to the attention of the Court was completely unnecessary." The court noted

that Jeremy had a prior conviction for domestic abuse battery. The court found that this factor did not favor either parent.

8. History of substance abuse, violence, and criminal activity: The court was concerned about the prescription medications taken by Jessica for her lupus and ADHD and the potential that those prescriptions could be abused. It noted its further concern regarding Jessica taking a friend's Percocet but found that Jessica's explanation lessened the court's concern. The court found that this factor slightly favored Jeremy but noted that Jeremy knew about Jessica's issues before signing the earlier joint custody agreement and leaving C.J. in her exclusive care.

9. Mental and physical health of each party: The court noted its earlier concerns about Jessica's use of prescription medications but did not find that this factor favored either party.

10. Home, school, and community history of child: "It is clear that she has spent almost her entire six years with her mother at her mother's home and schools where the mother lives." This factor favored Jessica.

11. Preference of the child: The court stated it did not know C.J.'s preference but noted Dr. Blackham's testimony regarding her loyalty to her mother.

12. Willingness and ability to facilitate relationship with the other parent: The court found that Jeremy's removal of C.J. from Jessica's care and Jessica's chronic tardiness to exchanges cancelled each other out and determined that this factor did not favor either parent.

13. Distance between the residences: This factor was not of any significance to the court in making its decision.

14. Responsibility of care and rearing of the child: The court discussed Jessica being C.J.'s primary caregiver for many years.

For the stated reasons, the trial court granted joint custody of C.J. to Jessica and Jeremy, with Jessica being named as the domiciliary parent. The court stated that Jeremy would have every other weekend visitation and if any parent is more than 15 minutes late to the exchange, it will be delayed until the next day. The court ordered that Jessica is required to submit to a 12-panel drug test at any time at Jeremy's request. The court detailed the alternating schedule for holidays. Jessica was ordered to provide Jeremy

with all school records and have C.J. evaluated for her preparedness for the first grade. The court ordered a date for the parties to return to court to review C.J.'s school records, including absences and tardies. A written judgment memorializing the custody arrangements was filed on August 31, 2023. Jeremy appeals that judgment.

## DISCUSSION

Jeremy asserts two assignments of error:

**First Assignment of Error: The district court erred in granting custody to Ms. Shelton despite the overwhelming evidence that Ms. Shelton having primary custody is not in C.J.'s best interest.**

**Second Assignment of Error: The lower court did not, despite finding that the underlying acts unquestionably occurred, find Ms. Shelton in contempt of court and did not award attorney's fees and/or court costs to Jeremy Jones.**

In his first assignment of error, Jeremy argues that the district court erred in naming Jessica as the domiciliary parent. Jeremy argues that the Article 134 factors weigh in his favor as the domiciliary parent.

The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; *Tripp v. Gener*, 55,654 (La. App. 2 Cir. 2/28/24), 382 So. 3d 447, *writ denied*, 24-00396 (La. 5/29/24), 385 So. 3d 701; *Abrams v. Turner*, 52,922 (La. App. 2 Cir. 9/25/19), 282 So. 3d 304. This determination requires a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of evidence presented in each particular case. *Abrams*, *supra*. The non-exclusive list of relevant factors to be considered in determining the best interest of the child found in La. C.C. art. 134 are:

> (1) The love, affection, and other emotional ties between each party and the child.

10

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

While the court is not bound to make a mechanical evaluation of all the statutory factors listed in Article 134, it should decide each case on its own facts in light of those factors. Nor is the court bound to give more weight to one factor over another; rather, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. *Abrams*, *supra*. The factors are provided as a guide to the court, and the relative weight given to each factor is left to the discretion

11

of the trial court. *Id.* The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. *Id.* Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. *Id.*

The trial court has great discretion in child custody cases based on its opportunity to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal absent an abuse of discretion. *Id.*

As this Court has noted:

> In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of witnesses and decide how much weight to give the testimony in light of the factors of La. C.C. art. 134.

*Abrams*, *supra*.

Considering the testimony and evidence available to the trial court, we do not find its ruling to be an abuse of its broad discretion. The record reflects that the trial court took great care in analyzing the Article 134 factors in its oral ruling, as detailed above. The trial court heard the witnesses and reviewed the evidence provided by each party, and it is in the best position to assess the credibility of witnesses and weigh the factors of Article 134. The record before us clearly indicates the trial court devoted significant attention to the applicable factors in its consideration of fixing custody of a young child between two caring parents who could not reach an amicable agreement themselves.

When confronted with two parents living in different locations who cannot arrive at a mutually agreeable custody arrangement on their own, the trial court is charged with the difficult task of crafting an appropriate custody arrangement for their small child. These parties are clearly acrimonious, and it seems unlikely that any arrangement created by the trial court would completely satisfy either parent.

Our review of the argument, testimony, and evidence in the record does not reveal anything that would render the trial court's ruling an abuse of discretion. We recognize Jeremy's arguments regarding Jessica's tardiness and potential drug use but note that the trial court clearly addressed all of the evidence presented to it and included provisions in its written judgment to account for both issues. Therefore, we conclude that the trial court did not abuse its discretion by awarding the parties joint custody and by naming Jessica as the domiciliary parent. Accordingly, this assignment of error is without merit.

In his next assignment of error, Jeremy argues that the trial court erred in not finding Jessica in contempt of court. Jeremy asserts that there was overwhelming evidence that Jessica was in violation of the trial court's orders because she was consistently late, allowed background noise on the telephone calls with C.J., allowed overnight visitors of the opposite sex while C.J. was in her home, and consistently failed to submit to court-ordered drug tests. He argues that she should be found in contempt and he should be awarded attorney fees.

Constructive contempt of court is defined as "willful disobedience of any lawful judgment, order, mandate, writ, or process of the court." La.

C.C.P. art. 224(2). Willful disobedience of any lawful judgment or order of the court constitutes a constructive contempt of court. *Keene v. Holdsworth*, 53,649 (La. App. 2 Cir. 1/13/21), 318 So. 3d 417; *Chauvin v. Chauvin*, 46,365 (La. App. 2 Cir. 6/22/11), 69 So. 3d 1192. Willful disobedience is defined as an act or failure to act that is done intentionally, knowingly, and purposefully, without justification. The party seeking contempt must show that the alleged offender willfully disobeyed a direct order of the court prior to the contempt rule. *Chauvin*, *supra*. A trial court is vested with great discretion in determining whether a person is to be held in contempt, and its discretion will not be reversed absent an abuse of that discretion. *Id.*

Review of the record in the case reveals that the trial court heard and considered the evidence presented by the parties regarding the issues listed above by Jeremy. Jessica argued that her tardiness was due to the distance between her home and Jeremy's home and her ADHD. She denied having overnight visitors of the opposite sex and reported to the court that she had broken up with her boyfriend. She denied intentionally monitoring or making phone calls between C.J. and Jeremy difficult. Finally, she denied refusing to submit to drug tests and the court was presented with multiple drug tests that she had completed. After a review of the record and the testimony given by the parties, it is clear that the trial court weighed the testimony carefully and concluded either that Jessica did not "willfully" violate the court's orders or that she had a justifiable excuse for her actions. The evidence presented does not amount to such an egregious violation of the court's orders as to reverse the trial court's abundant discretion. Accordingly, this assignment of error is likewise without merit.

14

**CONCLUSION**

For the foregoing reasons, the trial court's ruling is affirmed. Costs of this appeal are assessed to Jeremy Jones.

**AFFIRMED.**